# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| TINA LOUISE HUFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.    08-cv-1336 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

# O R D E R   &   O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Reversal and Defendant's Motion for Summary Affirmance.  (Docs. 14 & 17).  Plaintiff seeks judicial review under 28 U.S.C. § 405(g) of the Commissioner's decision that she is not disabled and thus not entitled to Social Security benefits.  Plaintiff has also filed a Response to Defendant's Motion for Summary Affirmance.  (Doc. 19).  For the reasons stated below, Plaintiff's Motion for Summary Reversal is denied, and Defendant's Motion for Summary Affirmance is granted.

## LEGAL STANDARD

To be entitled to disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination.  *See  McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).  The

factual determination is made by using a five-step sequential analysis. 20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to determine whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. § 404.1520(b). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(c). If the claimant has an impairment that significantly limits her physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. § 404.1520(d).

If the claimant does not qualify under one of the listed impairments at Step Three, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's Residual Functional Capacity ("RFC") is evaluated to determine whether the claimant can pursue her past work. 20 C.F.R. § 404.1520(e)-(f). If she cannot, then, at Step Five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. § 404.1520(g).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind

might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The claimant has the burden to prove disability through Step Four of the analysis, *i.e.*, she must demonstrate an impairment that is of sufficient severity to preclude her from pursuing her past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform her past work, the burden shifts to the Commissioner, at Step Five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id*.

A court's function on review is not to try the case de novo or to supplant the decision of the Administrative Law Judge ("ALJ") with the Court's own assessment of the evidence. *See Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). A court must only determine whether the ALJ's findings were supported by substantial evidence and "may not decide the facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the ALJ. *See Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed "so long as they find some support in the record and are not patently wrong." *See Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence. *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000). The ALJ is required to "sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence . . . and to enable us to trace the path of [his]

reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**BACKGROUND**

## I.      Procedural History

Plaintiff, who was born in 1984, applied for children's disability benefits in October 1994; her application was denied. In February 2005, following a hearing, Plaintiff was found to be disabled, and received benefits until she turned 18. The Social Security Administration at that time reviewed her case, and found that her disability ended in March 2003; after a hearing following Plaintiff's request for reconsideration of that decision, the agency again determined that she was not disabled, which Plaintiff did not appeal. That decision became final in 2004.

In May 2005, Plaintiff again filed for disability benefits, alleging that she became disabled in October 1994, which claim was denied initially and upon reconsideration. A hearing before ALJ Alice Jordan was held on this claim in April 2008. The ALJ issued her decision in June 2008, finding that Plaintiff was not disabled because she could perform medium level unskilled jobs with certain limitations, and that significant numbers of such jobs existed in the national economy. In addition, in this decision, the ALJ declined to reopen the earlier decision that Plaintiff's disability had ended in March 2003. The Appeals Council denied Plaintiff's request for review, and the ALJ's decision is thus the final decision of the Commissioner.

## II.     Relevant Medical History

On January 15, 2003, Plaintiff saw Dr. Steven Mayhew, a psychologist, who performed a psychodiagnostic disability assessment. (Tr. 178-80). He assessed her IQ at 82 for verbal, 97 for performance, and 88 for full scale. Dr. Mayhew found Plaintiff to be functional in the basic activities of daily living, with no apparent deficits or limitations. He did not review her medical history, and deferred her physical diagnosis to Plaintiff's medical doctors. He found that her "capacity to understand, retain, and follow work-related instructions and procedures [was] mildly impaired with significant functional limitations based upon her medical history." In addition, Dr. Mayhew opined that Plaintiff's capacity to interact appropriately was unimpaired, though her "capacity to tolerate stress and pressure of simple, unskilled work" and to respond appropriately was "estimated to be variable and in correlation to her medical status."

On January 22, 2003, Plaintiff underwent a pulmonary function analysis for disability evaluation purposes. (Tr. 181-85). She also underwent a state agency mental evaluation by Dr. John Tedesco on February 15, 2003. (Tr. 186-204). Dr. Tedesco found that Plaintiff had mild restrictions in her activities of daily living and mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In addition, he found either no significant limitations or only moderate limitations on Plaintiff's abilities relating to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Tedesco noted that Plaintiff's school absenteeism "appears to be motivational rather than

psychological," and opined that she was "competent for competitive employment, independent living, homemaking skills, recreation and leisure activities, transportation, and pursuing age-appropriate relationships." He found that there was no evidence to suggest a marked functional mental impairment on Plaintiff's ability to work.

Dr. Chrystalla Daly performed a Physical RFC Assessment on March 18, 2003. (Tr. 205-10). In this assessment, Dr. Daly found no exertional, postural, manipulative, or visual limitations. In addition, she found that Plaintiff should avoid concentrated exposure to extreme cold, fumes, odors, dusts, and gases, but that Plaintiff had no limitation regarding extreme heat, wetness, humidity, noise, vibration, or hazards. Dr. Daly stated that Plaintiff's asthma did not limit her functioning, and that though Plaintiff's symptoms were attributable to a medically determinable impairment, the severity or duration was disproportionate to the expected severity or duration.

Dr. Jackie Kramer has submitted progress notes for Plaintiff between 1998 and 2003. (Tr. 212-222). The majority of these notes simply record requests for refills of Plaintiff's inhaler or other medications. (Tr. 212, 215-16). On March 18, 2003, Plaintiff reported to Dr. Kramer's office with cold symptoms. Dr. Kramer observed that she was "really unsure how much medicine that [Plaintiff is] taking," as her last refill was in December 2002. Plaintiff said that she had been taking leftover pills, but Dr. Kramer explained that if she were taking them, she would eventually run out and need a refill; Dr. Kramer "firmly encouraged her once again to go back on her medications routinely," but noted that "Tina voices understanding,

however I doubt that she agrees." (Tr. 215). On March 28, 2003, Plaintiff complained of headaches for the last three days, which had caused vomiting the day before, and Dr. Kramer prescribed pain medication. (Tr. 213-14).

On April 24, 2003, Plaintiff came to Dr. Kramer's office because she had completely used up the inhaler refill that she had received on April 17, 2003; Dr. Kramer gave her a refill. Also, Plaintiff was short of breath and had itchy eyes. Dr. Kramer lectured Plaintiff about her responsibility to take her medications, and noted that "I know that she could feel better if she stayed on her meds, but she has not been faithful about doing that at all." (Tr. 212, 215). On June 24, 2003, Plaintiff reported to Dr. Kramer's office that she had been taking her medications for the past two weeks, and was feeling better and sleeping at night. (Tr. 212).

In October 2003, Physical and Mental RFC Assessments were performed by L.M. Hudspeth, who noted no physical limitations except the environmental limitation of avoiding fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 227-48). Hudspeth also noted that Plaintiff had experienced four asthma attacks in the last year. Plaintiff had a non-severe psychiatric impairment, and a history of learning disability, based on the prior IQ assessment noted above.

Plaintiff went to the emergency room having difficulty breathing on April 23, 2004; after receiving medication, she left the same day. (Tr. 306, 416). On July 2, 2004, Plaintiff began treatment at the Hygienic Institute in LaSalle, Illinois. (Tr. 347). Her progress note for that date states that she had two bad exacerbations of her asthma in the past year, with one hospital admission, and that her asthma symptoms are worse at night or with exertion. Plaintiff was given samples of

several of her medications. On July 7, 2004, she went to the emergency room, where she received a refill of her inhaler. (Tr. 305).

Between August 24, 2004 and September 9, 2004, the Hygienic Institute tried repeatedly to get Plaintiff to cooperate with their efforts to obtain financial assistance for her medication. (Tr. 345-46). On September 3, 2004, Plaintiff had an appointment at the Hygienic Institute, at which it was noted that the nurse spoke with her about the need for her mother to cooperate with requests for information in order for Plaintiff to get assistance. (Tr. 346). She was to have a follow up appointment on September 8, 2004 with her mother present, but failed to call or appear for the appointment. (Tr. 345). On September 9, 2004, she was given the release form for the information needed to get assistance, but by November 2, 2004, she had not returned the form to the Hygienic Institute, so the Hygienic Institute noted that it would not pursue her regarding the assistance. (Tr. 344-45).

On September 18, 2004, Plaintiff went to the emergency room complaining of shortness of breath. (Tr. 300-04, 417). Her chest was found to be tight, but she was not clinically in any distress; after receiving medication and samples to take home, Plaintiff was discharged the same day. On October 4, 2004, Plaintiff visited the Hygienic Institute again for a follow up, where it was noted that she was using her medications as prescribed. (Tr. 345). Plaintiff went to the emergency room on October 16, 2004, where she was observed with a mild exacerbation of bronchial asthma, given medication, and discharged the same day. (Tr. 298-99, 418). On November 17, 2004, Plaintiff visited the Hygienic Institute because of shortness of breath that was not helped by her medication. (Tr. 344). She was observed with an

acute exacerbation of severe persistent asthma, and was given medication. On the same day, prior to the visit, it was noted that Plaintiff had sought a medication refill only 13 days after an earlier refill.

Plaintiff had a follow-up visit at the Hygienic Institute on November 22, 2004, at which she reported feeling much better; she was using her medications as directed and was not using the nebulizer in excess of the prescribed dose. (Tr. 343). On January 17, 2005, the Hygienic Institute made a note of a phone call with Plaintiff, during which she was instructed to substitute a different medication for one that she could not afford. (Tr. 343). Plaintiff had a follow up visit at the Hygienic Institute on February 21, 2005, at which she reported that she was "doing good." (Tr. 341). On May 27, 2005, Plaintiff went to the Hygienic Institute with an asthma exacerbation, and was given medication. (Tr. 340). Plaintiff visited the emergency room on June 12, 2005, having had two or three days of shortness of breath, coughing, wheezing, and sore throat; she was assessed with bronchitis and exacerbation of bronchial asthma, given medication, and discharged that same day feeling much better. Plaintiff reported that she had earlier been outside at a cookout. (Tr. 296-97). On August 15, 2005, Plaintiff reported to the Hygienic Institute with an asthma exacerbation, and was given medication. (Tr. 339). On September 8, 2005, the Hygienic Institute noted that Plaintiff was instructed that if she needed inhaler refills more than once in a month, she would need to come in for a visit. (Tr. 342, 404).

Plaintiff was evaluated on July 6, 2005 by Dr. Donald Habecker, who performed a physical exam on Plaintiff and interviewed her about her medical

history; he did not review her medical records.  (Tr. 310-16).  Dr. Habecker noted that Plaintiff claimed to have asthma with four to six emergency room visits each year, allergies, eczema, low back pain caused by a "crooked back," and learning disabilities.  He diagnosed her, based on the physical exam and her stated history, with moderately severe asthma with six or seven bouts per year requiring steroids, back pain with exacerbations (but a normal exam that day), history of learning disability, and eczema that is controlled by medication.

On July 22, 2005, Dr. John Tamassetti performed a psychiatric review of Plaintiff based on her record, and found a non-severe impairment of history of learning disability.  (Tr. 351-63).  He found Plaintiff to have no restriction in activities of daily living, no difficulties in maintaining concentration, persistence, or pace, and no extended episodes of decompensation; he found only mild difficulties in maintaining social functioning.[1]  Dr. Kenney Charles assessed Plaintiff's Physical RFC on July 25, 2005, and found no physical limitations except for the environmental limitation of avoiding fumes, odors, dusts, gases, poor ventilation, and the like.[2]  (Tr. 367-74).

Plaintiff went to the emergency room on July 31, 2005 with an asthma exacerbation following exposure to cigarette smoke.  (Tr. 326-32).  After being given medication and treatment, Plaintiff had a deep breath and cough, and her lung sounds were improved; she was discharged that day.  She returned to the

---

[1]    This finding was reviewed and affirmed by Leslie Fyans on November 25, 2005.  (Tr. 365-66).

[2]    This finding was reviewed and affirmed by Burris Stanley on November 29, 2005.  (Tr. 375-76).

emergency room on August 3, 2005, having a "rather severe asthma attack." (Tr. 318-24).[3] Dr. Goldstone noted that Plaintiff had been in the emergency room a few days before and had been given prescriptions "but she did not bother to fill them…If she had filled them this would not have happened. I have no idea why she is totally noncompliant." He also noted that Plaintiff was out of her medication for her nebulizer at home, though she had claimed that the home nebulizer was not effective for her. After Plaintiff was treated, "her lungs became completely clear." Plaintiff was instructed that she needed to fill her prescriptions, and was also given six doses of medication for her home nebulizer, and was discharged the same day. Also on August 3, 2005, a chest X-ray was performed on Plaintiff, and the radiologist noted the impressions of "bronchial wall prominence that may be on the basis of reactive airway disease or bronchitis," and a "question of atelectasis." (Tr. 325).

Plaintiff visited the emergency room on September 21, 2005 with shortness of breath; she was diagnosed with an asthma attack. (Tr. 333-36). She showed marked improvement after an hour-long nebulizer treatment, and was discharged the same day. It was noted that she had run out of medication prior to the asthma attack. On December 9, 2005, Plaintiff reported to the Hygienic Institute for a follow-up appointment; she had a cold at the time. (Tr. 403). On December 27, 2005, Plaintiff's pharmacy called the Hygienic Institute to relate that Plaintiff could not afford Singular and Advair; it was noted that she needed refills through

---

[3]      One page of this sequence of records is hand-dated August 3, 3003. (Tr. 323). The Court believes this date to have been written in error, as it appears to be part of the August 3, 2005 records, and as the page also bears the date of August 3, 2005.

financial assistance. (Tr. 404). On January 12, 2006, the pharmacy informed the Hygienic Institute that Plaintiff had not yet picked up the Advair that was available for her; she picked it up on January 13, 2006. (Tr. 404).

On October 25 and 28, 2005, nurse practitioner Maryfran Crist of the Hygienic Institute wrote a letter to the Social Security Administration noting that Plaintiff had severe persistent asthma with frequent exacerbations requiring emergency care, allergies, and eczema. (Tr. 350, 402). Ms. Crist also noted that Plaintiff's medications had been provided to her by prescription assistance programs, and that there were multiple triggers for Plaintiff's asthma. She opined that Plaintiff's functional ability may be improved with treatment and care by specialists, but that she was unable to afford this treatment.

On May 18, 2006, Plaintiff entered the emergency room because she needed a refill of her inhaler but could not get in to see her doctor until the next day. (Tr. 385). On September 22, 2006, Plaintiff went the emergency room twice with an asthma exacerbation. (Tr. 379-84). She reported feeling much better after a one-hour nebulizer treatment. Plaintiff also had a chest X-ray while in the emergency room, which showed "a small left perihilar infiltrate," for which she was given medication. Plaintiff again visited the emergency room on November 14, 2006, after having mild, intermittent congestion for two days. (Tr. 408-09). She was diagnosed with an upper respiratory infection in addition to asthma, and was discharged the same day.

On February 7, 2007, Plaintiff went to the hospital with sudden chest pain, and had a chest X-ray. (Tr. 388). The radiologist noted "pulmonary opacity

suggestive of atelectasis, pneumonia, or infarct." No diagnosis or treatment was noted. On April 12, 2007, Plaintiff was admitted to the hospital for recurrent paroxysmal supraventricular tachycardia, for which she had radiofrequency catheter ablation.[4] (Tr. 394-98). She was discharged the next day, and was not considered by the physician to be at risk for future recurrences.

On April 30, 2007, Plaintiff entered the emergency room, having had a cough for three days; she was discharged the same day. (Tr. 410-11). She returned to the emergency room on June 19, 2007 having difficulty breathing. (Tr. 412-13). On July 1, 2007, Plaintiff visited the emergency room with shortness of breath and wheezing that had started two days before. (Tr. 390-92). She was treated, which resulted in complete resolution of her symptoms, and released the same day. On July 4, 2007, she again entered the emergency room with shortness of breath; after treatment, she was discharged that day. (Tr. 414-15). Plaintiff went to the St. Margaret's Community Health Clinic on July 18, 2007 for a follow-up visit. (Tr. 407). At that visit, Dr. Shawn Bailey noted that he would renew Plaintiff's Albuterol prescription, as she couldn't afford anything else. (Tr. 407).

On February 28, 2008, Plaintiff went to the emergency room with a cough, which was sometimes so hard that she vomited; she had also run out of her inhaler. (Tr. 393). She was assessed with an upper respiratory infection, and given instructions to take medications. There is a billing statement in the record that reflects an emergency room visit on April 9-11, 2008. (Tr. 399-401). There is also a

---

[4]     In the record of Plaintiff's history for this admission, it is noted that her asthma attacks bring her to the emergency room three or four times each year. (Tr. 394).

prescription-pad note from the Hygienic Institute noting that Plaintiff has severe asthma with frequent exacerbations requiring emergency care, that she becomes short of breath with minimal exertion, and that she is unable to afford pulmonology-specific care. (Tr. 782).

### III.    Hearing Testimony

Plaintiff appeared at a hearing before the ALJ on April 30, 2008, where she was represented by her attorney, Mark Wilson. (Tr. 786-827). Plaintiff's mother also appeared and gave testimony, as did a Vocational Expert, Ronald Malik. On the date of the hearing, Plaintiff was 23 years old, and lived in her mother's home. Plaintiff testified that she graduated from high school in 2005. Plaintiff was currently unemployed; her last job had been during the previous summer at Carus Corporation, which she had obtained through the Business Employment Skills Team, a program for youth. At Carus, she worked with the maintenance department, cleaning and doing odd jobs; she was allowed to sit or rest as much as needed. Plaintiff worked at Carus for five or six months. She stated that she missed so many days of work that they would not rehire her. Since then, Plaintiff had applied for work at Wal-Mart and Casey's, but had not heard back from either.

Prior to working at Carus, Plaintiff got a job through a temporary agency at Oak States, which is a cookie factory; Plaintiff inspected cookies. She held this job for two or three months, but was fired because she missed too many days being in the hospital. Plaintiff also noted that this job was difficult for her, as it was not easy for her to keep up with the pace of the work without triggering asthma attacks. Plaintiff's mother, who had worked next to her at Oak States, testified that Plaintiff

missed work often because of problems breathing. When Plaintiff was in high school, she worked through a work study program as a dishwasher. She had also worked as a telemarketer for a few months, but was fired because she could not type or read as fast as required. Plaintiff testified that she had intended to go to tech school to major in electronics or diesel mechanics, but that she could not afford the tools.

Plaintiff testified that she has asthma attacks that require her to go to the hospital at least five or six times per year, and an additional two or three times a year she would be kept as an inpatient. She also agreed with a question by her attorney that she went to the hospital about once a month. Plaintiff goes to the hospital "when [she has] bad attacks, [her] machine and [her] inhaler, both -- neither work. I can take several treatments and it still won't help me. Then I'd have to go to the emergency room. And get extra help breathing." (Tr. 804). When she goes to the hospital with an asthma attack, she is given oxygen and a breathing treatment similar to what she does at home, a steroid shot, and antibiotics. After such a hospital visit, Plaintiff testified that she is "worn down that [she] doesn't feel like doing anything…the next day. So [she] just stay[s] home to rest." (Tr. 808).

Plaintiff's asthma had existed since she was two years old, but she agreed with her attorney that it seemed to have been worse in the past few years. Her mother also testified that the asthma had gotten worse as Plaintiff gets older. Plaintiff testified that she cannot afford most of her asthma medications, because she needs two to three inhalers each month, and the doctor wants her to come in for an office visit for each refill, which requires that she pay for the office visit. She

stated that "90 percent of the time," she does not follow up with her primary care physician after a hospital visit because she can't afford to see him. She testified that when she goes to the doctor, she is given free samples of the medication she is prescribed. When asked by her attorney, Plaintiff testified that she is better when she is on her medication, but that she still has a difficult time.

Plaintiff also testified that she had heart palpitations the previous year, and had undergone surgery to correct it. Though physicians told her that it had been corrected, Plaintiff felt that it had come back and still happens. These heart palpitations can bring on an asthma attack. She testified that she hadn't followed up with a cardiologist because she can't afford to do so.

Plaintiff spends her days at home, watching movies and television, and reading magazines and the newspaper. She maintains her own room and can take care of her own personal hygiene, but does not help with laundry, cooking, dishes, cleaning, or yard work. Upon questioning by her attorney, Plaintiff stated that dressing was sometimes a struggle because an asthma attack would occur. Plaintiff testified that she does not attend any outside activities or organizations, and that her friends visit her at her home. Plaintiff goes shopping with her mother about once a week. She does have a driver's license, but she testified that she tries to limit her driving because she sometimes has asthma attacks in the car.

Plaintiff testified that she would be able to go to work tomorrow, if, for example, Casey's called to offer her a job. However, on questioning from her attorney, Plaintiff stated that she would not be able to maintain such employment for very long because of her frequent absences for hospital visits. Her attorney

noted that she had had many absences from school during her last three semesters of high school, which Plaintiff attributed to "asthma and going to the emergency room." (Tr. 808).

Plaintiff testified that cleaning chemicals set off her asthma attacks. In addition, she stated that walking around can trigger an asthma attack; most of the times Plaintiff that goes shopping she needs to sit down and use her inhaler. Humidity and cold weather are other triggers for Plaintiff's asthma, and she testified that she has allergies to trees, grass, smoke, and animals, so she tries to stay inside most of the time. Plaintiff's mother testified that she is allergic to grass, trees, mold, pasta, bananas, strawberries, and peppers, and that these allergies trigger asthma attacks. In addition, her mother testified that Plaintiff is allergic to Tide and Lysol.

Plaintiff testified that she has an asthma attack and needs to use her inhaler or nebulizer[5] three or four times on a typical day, and that on a bad day, she may need to use them four to six times. She stated that it was unpredictable when an asthma attack would occur; she needn't be exerting herself for one to happen, though they are more frequent when she is exerting herself. She agreed with her attorney that ordinarily, three to six times each day she would have to stop what she was doing and rest for 15 minutes for a nebulizer or inhaler treatment. Plaintiff testified that when she was working through Business Employment Skills Team at Carus, she usually had an asthma attack four to eight times a day. In

---

[5] Plaintiff testifies that she uses her nebulizer at home, during which time she must relax for 15 minutes and breathe in the treatment. The inhaler works in a similar fashion, but can be used away from home.

response to questions by the ALJ and her attorney, Plaintiff clarified that when she referred to a "day" in noting how often she had asthma attacks, she meant her waking hours.

Plaintiff's mother also testified. She noted that Plaintiff had received disability benefits since the age of nine, because of her asthma and her learning disability. Upon Plaintiff's father's death in 2001, Plaintiff received partial disability and partial survivor's benefits, both of which ceased when she turned 18. She testified that Plaintiff was in special education programs through high school. Her mother also noted that Plaintiff had been unable to get medical insurance, as the insurance companies would charge $900 per month to cover her, which the family cannot afford. Plaintiff had attempted to get medical coverage through public aid, but was unable to do so because she still lived at her mother's house. Plaintiff's mother testified that her cousin died at the age of 22 from asthma complications. She also testified that though her late husband had smoked, he had been a truck driver and was usually away from home.

The ALJ questioned the Vocational Expert at the hearing about the work that Plaintiff could do notwithstanding her limitations. First, the Vocational Expert reviewed the past work that Plaintiff had described in her testimony. After the ALJ reviewed Plaintiff's limitations with the Vocational Expert, she determined that there was no past relevant work to which Plaintiff could return. The Vocational Expert also identified no transferable skills from Plaintiff's past work.

The ALJ then asked the Vocational Expert whether there were other jobs available to a person with medium exertional capacity, who was limited to unskilled

work, with the environmental limitations of "no concentrated exposure to heat, cold, humidity, fumes, odors, dust," and an indoor environment where temperature and atmosphere are controlled.  The Vocational Expert testified that representative jobs that such a person could perform were pharmaceutical packager (2900 positions, sedentary and unskilled), novelty assembler (3000 positions, sedentary and unskilled), office helper (7900 positions, light and unskilled), document prep clerk (2800 positions, sedentary and unskilled), routing clerk (7800 positions, light and unskilled), telephone information clerk (4500 positions, sedentary and unskilled), and information clerk (3500 positions, light and unskilled).

The ALJ then posed the hypothetical question of whether these jobs would be available to a person who had 21 unexcused absences per year, to which the Vocational Expert replied that they would all be available.  He testified in response to the ALJ's next question that 27 unexcused absences would eliminate these positions.  The ALJ further inquired of the Vocational Expert whether, if a person needed to take a 15-minute rest period six times per shift, these jobs would be available.  The Vocational Expert replied that only the telephone information clerk and information clerk jobs would be eliminated, as they require interaction with the public, but that the other jobs would remain.

## IV.  ALJ's Decision

On June 24, 2008, the ALJ issued her decision in Plaintiff's case.  (Tr. 17-27).  First, she declined to reopen, on the basis of collateral estoppel, the Commissioner's June 2004 decision to cease Plaintiff's disabled child benefits in March 1, 2003, following a redetermination upon her turning age 18.

Second, the ALJ determined that Plaintiff had not been under a disability from March 1, 2003 through the date of her decision. After finding that Plaintiff was not insured, and that her part-time work after March 1, 2003 did not constitute substantial gainful activity, the ALJ moved to Step Two of the five-step sequence. At Step Two, the ALJ found that Plaintiff had a severe combination of impairments: recurrent paroxysmal supraventricular tachycardia, asthma, history of learning disorder.

The ALJ then compared Plaintiff's impairments to the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, and found that she did not have an impairment that met or medically equaled on of the listed impairments. Specifically, the ALJ considered Listing 3.03, asthma, for which the claimant must have either chronic asthmatic bronchitis or a certain type of attacks. She implicitly rejected chronic asthmatic bronchitis. Further, the ALJ found that Plaintiff's attacks did not meet the required level of frequency: the attacks must occur, "in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks." The ALJ found that there was no evidence that Plaintiff's attacks met these requirements in spite of prescribed treatment.

The ALJ also considered Listing 12.05, mental retardation, and found that it did not apply to Plaintiff. In order for a claimant to meet this Listing, she must meet the requirements of one of four paragraphs. Paragraph A requires "Mental

incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded." As Plaintiff could care for her own hygiene, drive a car, and run errands, she did not meet this paragraph. Paragraph B requires "A valid verbal, performance, or full scale IQ of 59 or less," which does not apply to Plaintiff. Under paragraph C, the claimant must have "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," which also did not apply to Plaintiff.

Finally, for paragraph D, "A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two" other four listed difficulties, must be shown. The ALJ found that none of the four restrictions were shown. Plaintiff had only mild restriction in "activities of daily living," only mild "difficulties in maintaining social functioning," only moderate "difficulties in maintaining concentration, persistence, or pace." Further, Plaintiff had no "episodes of decompensation." In compliance with Social Security Ruling 96-8p, the ALJ considered a more detailed assessment of these four categories in determining the severity of Plaintiff's mental impairment, in order to determine Plaintiff's mental RFC at Steps Four and Five.

At Step Four, the ALJ found that Plaintiff had the RFC to perform unskilled, medium work, but was limited to work activity that involved no concentrated exposure to heat, cold, humidity, fumes, odors, or dust. She could only work in an indoor environment with a regulated temperature and no heavy dust or pollen. In finding this RFC, the ALJ first found that Plaintiff's medically determinable

impairments could be reasonably expected to produce the symptoms she alleged. However, she determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they conflict with the RFC. This was so because there was "ample evidence" that many of Plaintiff's needed asthma treatments were caused by her noncompliance with her treatment regimen. Continuing with Step Four, the ALJ found that Plaintiff had no past relevant work to which to return, and that transferability of job skills was not material to the determination of disability.

The ALJ then determined, at Step Five, that, considering Plaintiff's age, education, work experience, and RFC, there were a significant number of jobs in the national economy that Plaintiff could perform. The ALJ relied on the vocational expert's testimony that such jobs existed, given the limitations on Plaintiff's ability to perform medium work. These jobs included pharmaceutical packager, novelty assembler, officer helper, document preparation clerk, routing clerk, and telephone information clerk. Because Plaintiff could perform work at jobs that exist in significant numbers in the national economy, Plaintiff was not under a disability from March 1, 2003 through the date of the decision.

## DISCUSSION

Plaintiff argues that the ALJ committed six errors in her June 2008 decision: (1) failing to consider whether Plaintiff was properly found to be not disabled in 2004, (2) failing to consider all of Plaintiff's limitations in assessing her impairment, (3) assessing Plaintiff's RFC at Step Four, (4) failing to consider Plaintiff's absenteeism as a limitation at Step Five, (5) failing to properly weigh Plaintiff's

mental condition in evaluating Plaintiff's ability to work, (6) failing to properly weigh Plaintiff's asthma in evaluating her ability to work.[6]  Each of these is considered in turn.

## I.    The ALJ did not err in not reconsidering the Commissioner's 2004 decision that Plaintiff was no longer disabled

Plaintiff's childhood disability benefits were terminated when she turned 18, after a finding that she was no longer disabled.  In her decision, the ALJ declined to reopen this earlier determination, citing principles of collateral estoppel.  As pointed out by Defendant, under *Califano v. Sanders*, federal courts lack jurisdiction to review the Commissioner's decision not to reopen an earlier application.  430 U.S. 99, 107-08 (1977).  Claims that the Commissioner abused its discretion in deciding not to reopen a prior determination are not reviewable by federal courts, as Congress decided in the Social Security Act to limit "judicial review to the original decision denying benefits."  *Id*. at 108.  Here, Plaintiff claims that the ALJ erred in not reopening the 2004 decision of the Commissioner, and the Court has no jurisdiction over such claims.

The only exception applies where the claimant has a "colorable constitutional claim," over which federal courts always have jurisdiction.  *Id*. at 109.  However, the "the refusal to reopen the decision itself must raise the constitutional question;" it is not enough that the initial decision was constitutionally suspect.  *Steebe v. U.S.*

---

[6]      In her Response, Plaintiff notes that none of Plaintiff's past jobs were "past relevant work," and that Plaintiff had no transferable skills.  (Doc. 19 at 3).  As the ALJ noted both of these facts in her opinion, it is unclear what the import of these facts is intended to be.  The ALJ's decision as to Plaintiff's ability to perform other jobs in the national economy was not based on a finding that she could return to her past relevant work, nor on a finding that she had transferable skills.  (Tr. 9).  The Court finds no colorable allegation of error in this statement of Plaintiff's.

*R.R. Retirement Bd.*, 708 F.2d 250, 256 (7th Cir. 1983) (*citing Sanders*, 430 U.S. at 109). Plaintiff argues that she has a colorable constitutional claim, because she "has a mental impairment of a learning disability and is a minor for social security purposes and does not have an attorney." (Doc. 14 at 5). This argument does not place Plaintiff within the exception, as, at the time the ALJ made the decision not to reopen the 2004 decision, Plaintiff was no longer a minor and, more importantly, was represented by an attorney. (Tr. 784). Whatever effect Plaintiff's learning disability may have had on the fairness of the decision is mitigated by the fact that she had an attorney at the relevant time. Therefore, the Court lacks jurisdiction to review the ALJ's decision not to reopen the 2004 determination that Plaintiff was no longer disabled.[7]

Plaintiff also conclusorily suggests that the ALJ "de facto" reopened the 2004 decision "by referring to evidence in the file from January 9 and 12, 2002 and cit[ing] the State Agency mental and physical assessments of March 18, 2003 and October 23, 2003 in her denial." (Doc. 14 at 5). However, the ALJ did not reopen the earlier decision by referring to evidence relating to it, as she did not review the merits of the earlier decision in doing so. *Reynolds v. Bowen*, 844 F.2d 451, 453 (7th Cir. 1988) (ALJ did not reopen prior proceedings by mentioning earlier evidence where he did not review the merits of prior proceedings.).

---

[7] Plaintiff makes several arguments in her Response that are addressed to the merits of the ALJ's decision not to reopen the 2004 decision. (Doc. 19 at 1-3). As the Court does not have jurisdiction to review the ALJ's decision not to reopen, it need not consider Plaintiff's arguments against that decision.

**II.    The ALJ did not err in considering Plaintiff's limitations in assessing her impairment**

After reviewing Plaintiff's combination of severe impairments found by the ALJ, Plaintiff argues that the ALJ erred in not including "the effect of combining asthma with severe allergies."  However, other than citing to symptoms of asthma and Listing 3.03 (which was considered by the ALJ), Plaintiff does not specify the legal or factual error the ALJ is alleged to have made, nor does she "cite to the record by page number the factual evidence which supports the plaintiff's position," as required by Local Rule 8.1.  As Defendant notes, it appears that Plaintiff is arguing that the ALJ improperly applied Listing 3.03 to her, as Plaintiff recites the Listing almost verbatim in her memorandum.

The ALJ properly considered the requirements of Listing 3.03, and substantial evidence supports her determination that Plaintiff's impairments do not meet the Listing.  First, the ALJ implicitly rejected 3.03(A), chronic asthmatic bronchitis, which is evaluated under the criteria for chronic obstructive pulmonary disease.  In order to show chronic obstructive pulmonary disease, a claimant must have a maximum forced expiratory volume within certain ranges.  Plaintiff has pointed to no record evidence that any physician has diagnosed her with either chronic asthmatic bronchitis or chronic obstructive pulmonary disease.  Therefore, the ALJ did not err in implicitly rejecting Listing 3.03(A).

The ALJ explicitly considered Listing 3.03(B), and found that Plaintiff's asthma attacks did not occur with the required frequency, in spite of prescribed treatment.  As noted above, this Listing requires that attacks occur, "in spite of prescribed treatment and requiring physician intervention, [] at least once every 2

months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks." The ALJ found that Plaintiff's asthma attacks requiring medical treatment did not occur *in spite of* prescribed treatment, as they often occurred when Plaintiff had failed to comply with her prescribed treatment. This finding was supported by substantial evidence, as numerous doctors noted that Plaintiff was repeatedly noncompliant with her medication. Also, as discussed below, the medical record shows that Plaintiff visited her doctor or the emergency room for asthma attacks an average of only four times per year during the relevant time, and was only kept overnight once.

## III.    The ALJ did not err in assessing Plaintiff's RFC at Step Four

Plaintiff argues that the ALJ erred in assessing her RFC in three ways: (a) not including absenteeism as a limitation on Plaintiff's RFC, (b) misstating the record as to Plaintiff's testimony concerning her ability to work at Casey's, and (c) ignoring the side effects of asthma treatment. As the first argument is duplicative of Plaintiff's argument relating to Step Five, the Court will consider it when assessing the ALJ's consideration of her absenteeism under heading IV.

As noted above, the ALJ asked Plaintiff if she would be able to work at Casey's if they were to call her and offer a job, to which Plaintiff replied that she would. Later, Plaintiff's attorney asked if such a job would be sustainable long-term, to which Plaintiff replied that it would not, as she would need to miss work

because of asthma attacks. In her opinion, the ALJ noted these two exchanges without comment, except to note that Plaintiff's attorney's question was leading.

Plaintiff now argues that this characterization is somehow evidence of an error by the ALJ, though she does not indicate what effect it is supposed to have had on the ALJ's decision. (Doc. 14 at 9). She states that, "[a]gain under *Hickman* the ALJ is required to give priority to the impairment and not the child being lead [*sic*] by the ALJ or the attorney." This appears to be a reference to Plaintiff's earlier argument under *Hickman v. Apfel*, relating to the ALJ's decision not to reopen the Commissioner's 2004 determination. 187 F.3d 683 (7th Cir. 1999). Plaintiff does not cite to a particular page or quotation from *Hickman* in reference to the instant argument, but cited page 690 in reference to her earlier argument. On that page, the Seventh Circuit held that it was inappropriate, in a child disability case, for the ALJ to rely on "non-medical testimonial evidence to determine that Hickman's impairment did not equal" a Listing, as children are more frail than adults and their testimony is unreliable. *Id.* at 689-90.

In mentioning the above-noted exchange regarding working at Casey's, the ALJ was assessing Plaintiff's RFC, not whether she met one of the Listings. Further, as the ALJ declined to reopen Plaintiff's child disability case, the regulations applicable to child disability cases were no longer applicable to her; indeed, RFC is not assessed in child disability cases. *Id.* at 687. In assessing an adult claimant's RFC, "the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.

1995) (*citing* 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a)). Therefore, it was proper for the ALJ to consider Plaintiff's testimony as to her ability to work in assessing her RFC.

Plaintiff further argues that the ALJ erred in ignoring the "serious side effects of asthma treatment." (Doc. 14 at 9). She cites her own testimony that following an asthma treatment in the emergency room, her "chest hurts," and she is "so worn down that [she doesn't] feel like doing anything or going to school the next day," so she stays home to rest. (Tr. 808). Plaintiff does not allege that this "side effect" encompasses anything more than possibly an additional day of rest following an emergency room visit; the ALJ properly considered the number of days that Plaintiff would need to miss work, as discussed below. Further, the ALJ was in the best position to determine whether this testimony was credible insofar as it alleged a further limitation on Plaintiff's ability to work, and she specifically found Plaintiff to be not credible to the extent that her testimony conflicted the Plaintiff's RFC, in part because she had been able to complete high school and engage in full-time work prior to turning 18, at a time when her symptoms were present at the same level of severity as at the relevant time according to Plaintiff's testimony.

## IV. The ALJ did not err in considering Plaintiff's absenteeism

Plaintiff argues that the ALJ erred in not considering the effect of Plaintiff's absenteeism on her RFC and on her ability to fulfill the requirements of the jobs listed at Step Five. First, she argues that the ALJ erred by not including absenteeism as a limitation on Plaintiff's RFC. She cites to her own testimony that she had been fired from her previous job at a cookie factory because she missed too

many days being in the hospital, and that she is at the hospital five or six times each year, being kept as an inpatient an additional two or three times a year. (Tr. 795-96). Other than noting that in Social Security Ruling 96-8p, work requires one's presence on "a regular and continuing basis," Plaintiff does not elaborate on this argument. Plaintiff also argues that the ALJ erred in failing to consider the effect of Plaintiff's absenteeism on her ability to hold a job listed at Step Five. To the contrary, in her opinion, the ALJ explained the substantial evidence that led to her conclusion that Plaintiff's absences did not need to be as detrimental to Plaintiff's job prospects as Plaintiff claimed: she had been able to attend school regularly enough to graduate,[8] and tended to have asthma attacks requiring medical attention when she did not comply with her prescribed treatment.

---

[8]    In her Response, Plaintiff argues that a note from her high school shows her to have had 73 absences in three semesters, or approximately 15 months of school, which would average out to five days a month; these semesters were the spring of 2004 and the entire 2004-2005 school year. (Tr. 783) However, Plaintiff's teacher noted in March and June 2005 that Plaintiff was coming to school more regularly, while her attendance in earlier years was "awful," her attendance in 2004-2005 was "excellent. (Tr. 276, 287). The ALJ noted the teacher's statement that Plaintiff was coming to school more regularly as part of her determination that Plaintiff's claims regarding the limiting effects of her impairments were not completely credible.

The school's note covering the three semesters does not indicate the distribution of absences between the semesters. However, the school also submitted records from Plaintiff's 2004-2005 school year, which shows 22.5 absences during the two semesters, which, assuming a typical nine-month school year, averages 2.5 absences a month; the record from 2003-2004 shows 50.5 absences. (Tr. 282-83). Obviously Plaintiff's school attendance improved, though she argues that her medical condition was the same or declined during this period, indicating that motivation, not her physical condition, drove much of her absenteeism. Though 2.5 absences is just over the threshold the Vocational Expert identified for absenteeism tolerated at work, it is a reasonable assumption that since, as Plaintiff points out, schools tolerate more absences, Plaintiff would make more of an effort to be at work as required. In addition, as discussed further below, both Plaintiff's testimony and the objective medical record show that Plaintiff does not need to miss 2.5 days of work per month.

In addition, in questioning the Vocational Expert about what jobs would be available to someone with Plaintiff's limitations, the ALJ specifically asked him whether the jobs he suggested would be available to a worker who had 21 absences per year. The Vocational Expert testified that all of the jobs would be available so long as the worker did not miss more than 24 days per year. (Tr. 822-23). Plaintiff testified that she visited the hospital five or six times a year and was only kept overnight as an inpatient two or three times per year; this works out to far fewer than 24 absences in a year, even if those inpatient visits were each two or three days long.[9] Therefore, it is clear that the ALJ did consider the fact that Plaintiff would miss some work days, and confirmed with the Vocational Expert that these absences would not affect her ability to hold the jobs suggested by the Vocational Expert.

## V.  The ALJ did not err in weighing Plaintiff's mental condition in evaluating Plaintiff's ability to work

Plaintiff argues that "every aspect of her life is affected by her asthma," and that the ALJ neglected to consider this in assessing Plaintiff's mental abilities. The ALJ need only consider the effect of limitations that are supported by the record. Here, the ALJ noted that Plaintiff had a history of a learning disability, but also noted that she had been able to complete high school. In addition, as noted above, the ALJ incorporated her assessment of Plaintiff's abilities under the four categories of functioning listed in paragraph D of Listing 12.05 into her assessment

---

[9]     The medical record discussed above shows that the longest time Plaintiff stayed in the hospital for an asthma-related reason was three days (and that this was the only overnight hospital stay), and that she only had doctor or hospital visits for asthma exacerbations 20 times in over five years, which averages out to four exacerbations requiring medical attention per year.

of Plaintiff's ability to work. Each of these assessments found that Plaintiff had only mild or moderate difficulties, and each was supported by substantial evidence, such as the several RFC assessments noted above. The ALJ's incorporation of these limitations into Plaintiff's RFC is borne out by the fact that the ALJ specified that Plaintiff was limited to unskilled work.

Plaintiff also cites to *Kasarsky v. Barnhart*, quoting language that an ALJ must incorporate a limitation of "borderline intelligence" into the hypotheticals posed to the Vocational Expert. 335 F.3d 539, 542 (7th Cir. 2003). This case is inapplicable to Plaintiff's situation, as it involved a man who functioned at a fourth-grade reading and spelling level, a third-grade level in basic computations, would be unable to complete a job application or read a newspaper, and had failed four times to obtain a GED; Plaintiff, on the other hand, can read and write, and has obtained her high school diploma, as shown by her own testimony and school records.

## VI. The ALJ did not err in weighing Plaintiff's asthma in evaluating her ability to work

After reviewing instances of Plaintiff's medical history with asthma, Plaintiff complains that the ALJ erred in four ways related to Plaintiff's asthma: (a) the ALJ's "concern with smoking in front of" Plaintiff, (b) the ALJ's note that Plaintiff was noncompliant with her prescribed medications, (c) her failure to note certain chest X-rays of Plaintiff, and (d) her failure to consider the fact that while in school Plaintiff used her inhaler as often as needed.

Some of Plaintiff's medical records show physicians' concern with the fact that Plaintiff's father had apparently smoked in the home. At the hearing, the ALJ asked Plaintiff's mother whether anyone in the home smoked after Plaintiff's

father's death in 2001, and Plaintiff's mother informed her that no one smoked in their home anymore. There is no indication in the ALJ's opinion that she considered the father's past smoking as a factor weighing against Plaintiff in making her decision. Indeed, the ALJ recognized that Plaintiff's asthma was exacerbated by airborne irritants such as smoke, and incorporated it into her RFC for Plaintiff by limiting her to work environments that were free of concentrated exposure to fumes, odors, and dust. The ALJ's consideration of whether Plaintiff was exposed to cigarette smoke was not error.

The ALJ also noted that the record showed Plaintiff to have been noncompliant with her medications, and considered this fact in finding that Plaintiff did not meet Listing 3.03(B) and that her statements concerning the limiting effects of her asthma were not credible to the extent they conflicted with the RFC. Plaintiff contends that giving this weight to Plaintiff's noncompliance was in error, as Plaintiff testified that the reason she was noncompliant was that she was often unable to afford her medications. Plaintiff states that "[i]t is error for the ALJ to make an inference on the failure to seek medical treatment without considering any explanation the individual may provide." *Brennan-Kenyon v. Barnhart*, 252 F.Supp.2d 681, 696 (N.D. Ill. 2003).

The ALJ did explicitly consider Plaintiff's stated reason, and found it to not be credible, as "the claimant had medication available on a number of occasions, and simply chose not to take it." It is the ALJ's province to make credibility judgments, which will be upheld if they contain specific reasons that are supported by the record, unless Plaintiff can show that they are "patently wrong." *Skarbek v.*

*Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004). Her decision was supported by the record, as the medical records citing Plaintiff's noncompliance only rarely indicate any complaint by her that she could not afford the medication, though they reflect that Plaintiff was repeatedly admonished to take her medication. (Tr. 215, 319-20). Further, throughout 2003, 2004, and 2005, Plaintiff had extended periods of time during which obtained refill prescriptions from her physicians on a regular basis, indicating that she was able to afford the medications satisfactorily. (Tr. 212-22, 347). Finally, as discussed above, Plaintiff did not initially cooperate with the Hygienic Institute's efforts to obtain financial assistance for her medications, which indicates that she did not seriously believe that it was needed. (Tr. 344-46). It it appears from a later note by Maryfran Crist of the Hygienic Institute that she was able to obtain medication with financial assistance, which indicates that she could get her medications when needed because of financial assistance. (Tr. 350). The ALJ's credibility finding is not patently wrong, and will not be disturbed by this Court.

Plaintiff cites chest X-rays performed on her in 2005, 2006, and 2007.[10] (Tr. 325, 382, 388). The radiologists noted that the 2005 and 2006 X-rays showed bronchial wall prominence that may be on the basis of reactive airway disease or bronchitis; the 2005 X-ray also raised a question of atelectasis. (Tr. 325, 382). The 2007 X-ray revealed pulmonary opacity suggestive of atelectasis, pneumonia, or infarct. (Tr. 388). Plaintiff accuses the ALJ of "playing doctor" by failing to address

---

[10] In this same paragraph, Plaintiff notes an April 2007 diagnosis of recurrent paroxysmal supraventricular tachycardia. (Tr. 308). It is unclear what error Plaintiff alleges in citing this diagnosis, especially since the ALJ incorporated it into her assessment of Plaintiff's "severe combination of impairments."

this evidence.  As Defendant points out, however, for the ALJ to have independently evaluated the import of these X-rays would have been more like playing doctor than to rely on the interpretations of Plaintiff's physicians.  None of these "questions" or "suggestions" raised by the X-rays are diagnoses – they are merely speculations by a radiologist.  Plaintiff points to no instances in the record where any of her treating physicians relied on these X-rays in making a diagnosis of a disabling condition.  The only X-ray apparently reviewed by a physician was the 2006 X-ray, from which Dr. Toofan noted a "small left perihilar infiltrate," and gave Plaintiff azithromycin, which treats infection; there is no indication in the record that this condition was lasting or disabling.  The ALJ is not qualified to take the results of X-rays and independently examine them to determine their effect on Plaintiff's functioning.  The ALJ did properly consider and weigh the evidence that was relevant to her assessment of the effect of Plaintiff's asthma.  Therefore, it was not error for her to not undertake the task of X-ray interpretation.

Finally, Plaintiff argues in her Response that the ALJ should have considered the fact that Plaintiff was able to use her inhaler as often as needed while in school.  However, Plaintiff does not indicate what effect consideration of this is supposed to have had on the ALJ's decision.  The Court assumes that it is intended to show that the ALJ did not consider the effect of Plaintiff's need to use her inhaler frequently on her ability to work, as work is more demanding than school.  In assessing Plaintiff's ability to work with the Vocational Expert, the ALJ explicitly asked him whether the suggested jobs would allow for breaks to use the inhaler as frequently as Plaintiff needed to use it, which, according to Plaintiff's

testimony, would be four to six times during her waking hours on a bad day. The Vocational Expert testified that six such breaks would be allowable for all but two of the suggested jobs; six breaks would meet Plaintiff's needs, even on a bad day, according to her testimony. Therefore, it was not error for the ALJ not to explicitly mention the fact that Plaintiff could use her inhaler as needed while in school.

CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Reversal (Doc. 14) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 17) is GRANTED.

CASE TERMINATED.

Entered this <u>19th</u> day of February, 2010.


                                        s/ Joe B. McDade
                                        JOE BILLY McDADE
                                        United States District Judge